CYNTHIA M. RUFE, District Judge.
AND NOW , this 11th day of December 2018, upon careful and independent consideration of the Petition for Writ of Habeas Corpus, and all related filings, and upon review of the Report and Recommendation ("R & R") of United States Magistrate Judge Timothy R. Rice, and Petitioner's objections, it is hereby ORDERED that:
1. Petitioner's Motion to Supplement Objections [Doc. No. 28] is GRANTED .[1]
*465 2. The Objections are OVERRULED and the R & R [Doc. No. 22] is APPROVED and ADOPTED[2] ;
3. The Petition for Writ of Habeas Corpus is DISMISSED WITH PREJUDICE and without an evidentiary hearing;
4. There is no probable cause to issue a certificate of appealability[3] ; and
5. The Clerk of Court is directed to CLOSE the case.
It is so ORDERED .
REPORT AND RECOMMENDATION
TIMOTHY R. RICE, U.S. MAGISTRATE JUDGE
Petitioner Tyree Bass, a prisoner at the State Correctional Institution in Albion, Pennsylvania, filed a pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He alleges, inter alia, ineffective assistance of trial counsel based on a detailed series of errors. For the reasons *466 described below, I recommend dismissing his petition with prejudice.
FACTUAL AND PROCEDURAL HISTORY
In March 2010, Bass was convicted by a jury of second degree murder, attempted murder, aggravated assault of an unborn child, conspiracy to commit arson, and possession of an instrument of crime, for shooting Kevin Cook and his pregnant fiancée, Emine Hajredinaj. See Commonwealth v. Bass, CP-51-CR-0005903-2008, Dkt. ("Crim. Dkt.") at 4-5. Evidence at trial showed two men had brought a red gas can and two Molotov cocktails to the area outside Cook's Philadelphia home late on January 29 and early on January 30, 2008. Commonwealth v. Bass, at 5-7 (C.C.P. Aug. 11, 2010) ("Tr. Ct. Op."). One man, wielding a shotgun, killed Hajredinaj and severely injured Cook and his then-unborn child by firing directly into their stopped car. Id.
Police officers described the scene of the crime, and the surviving victim, Kevin Cook, testified. N.T. 2/22/10 at 4-91. At the time of the shooting, Cook lived with Hajredinaj, their one-year-old daughter, and his teenage cousin. Id. at 91-92. His sister, Cassandra Cook-Powell, her husband, Charles Powell, and their two children were also staying with them. Id. Cook met Bass several weeks before the shooting through a mutual friend, Kenny Watts. Id. at 137, 147. Some time before the shooting, Cook had driven Cassandra to Bass's home, where she broke the windows because Bass owed her money. Id. at 114. Two days before the shooting, Cook heard Bass tell Cassandra to "watch her back." Id. at 183.
The night of the shooting, Cook and Hajredinaj made a quick, late-night visit to McDonald's. Id. at 97. Upon their return, Bass approached Cook's car with a shotgun. Id. at 97-98. Cook spoke to Bass for several minutes, explaining that Cassandra was not home, Hajredinaj was pregnant, and children were in the house. Id. at 98-100. Bass fired directly into the car, before fleeing on foot with his co-conspirator. Id. at 98-100, 105. Powell was the first family member to come outside after the shooting, and Cook told Powell that Bass had shot him. Id. at 190-91. Cook's neighbor, Victor Clark, drove him to the hospital in a white car. Id. at 106-07, 215. Cook did not identify Bass to Clark, telling him only "somebody shot me." Id. at 106-07, 215, 232. Cook briefly spoke to a police officer at the hospital, where he again failed to identify Bass. Id. at 106-07; see also N.T. 2/24/10 at 99 (Cook told officer at hospital he had been shot by two black males, one of whom wore a "skully" cap). Cook then lost consciousness, and remained in a coma for approximately two weeks. Id. at 107.
After Cook had testified for two-and-a-half hours, the trial recessed. Id. at 192-204. In chambers, the trial court expressed concern that Cook was "break[ing] down," and limited defense counsel's questioning to discrepancies between Cook's various statements. Id.
The following day, Cassandra testified that Watts had arranged for her to be paid $1,000 for helping Bass secure a large tax refund. N.T. 2/23/10 at 6-7. When Bass received an approximately $4,000 refund but refused to pay her, she broke the windows of his home with a brick. Id. at 10, 42. Cassandra acknowledged that, in exchange for her testimony, the Commonwealth had agreed not to prosecute her for breaking Bass's windows or for assaulting an officer who responded to the shooting. Id. at 17-18. She further acknowledged fighting with her husband the night of the shooting, and admitted the fight had left blood in her car. Id. at 61.
*467 Defense counsel had Cassandra read aloud her police statement, in which she detailed her illegal agreement with Bass. Id. at 76-89. At sidebar, the Commonwealth contended this violated an earlier trial court order, and requested a limiting instruction. Id. at 81. The court instructed the jury to disregard the question and answer. Id. at 85, 90.
Watts corroborated Cassandra's testimony about the tax scam, and explained he was supposed to have received a $200 referral fee. Id. at 95, 108. Watts said Bass had threatened to get a shotgun rather than pay Cassandra's fee, and Watts heard Bass threaten Cassandra after she broke his windows. Id. at 95-97. Watts also corroborated Cook's account of socializing with Bass. Id. at 104-05. On cross-examination, Watts read his police statement, in which he admitted he had spoken with Powell shortly after the shooting, but Powell had not told him who shot Cook. Id. at 134-35.
Police testified the red gas can was not filled with regular gasoline, but diesel fuel or some other petroleum distillate. N.T. 2/24/10 at 14-17. Michael Green, Cook's teenage cousin, testified he was home the night of the shooting and saw two men outside, although he could not tell if either one was Bass because he could not see their faces. Id. at 71-72.
Detective John Harkins, who took Cook's statement in the hospital, testified that Cook had not mentioned that he had identified Bass to Powell earlier. Id. at 200. Harkins acknowledged that police had questioned Cook only once, the day he emerged from his coma, and had not contacted him again before Bass's preliminary hearing. Id. at 205-06, 218. Harkins further testified Watts had provided a 267 phone number to reach Bass, but that it had not been registered to Bass or Bass's girlfriend, and that a search of Bass's home yielded no evidence related to the shooting. Id. at 205-06.
Before putting on the defense, counsel notified the court that Bass's former girlfriend, Jillian Sanders, said police had threatened to charge her with perjury if she testified. Id. at 54-55. Outside the presence of the jury, Harkins testified he had told Sanders he did not believe her alibi for Bass, that people who lied under oath were subject to perjury charges, and that perjury convictions had to be reported to employers. Id. at 62-63. The trial court told defense counsel that, if Sanders refused to testify, counsel should ask her about the detective's statements so the jury could "just hear everything and make their own decisions." Id. at 66. Counsel also informed the court that Powell was avoiding their subpoena, likely due to an outstanding bench warrant. Id. at 74.
Sanders testified that, on the night of the murder, she had been at a bar with Bass from 10:00 p.m. to 2:00 a.m. Id. at 93-94. Although Sanders said she accompanied Bass when he surrendered at the police station, she did not tell them about Bass's alibi because she did not see an opportunity to do so, and no police contacted her. Id. at 95-96. She also said she did not notify Bass's counsel of the alibi at Bass's preliminary hearing. Id. at 113. She identified her cellphone and home phone numbers, and acknowledged that she had regularly let Bass use her phone. Id. at 127-28. She testified she did not recognize the 267 number. Id. She said Bass had filed his tax return through H & R Block on January 30, 2008, and confirmed that Watts was supposed to have received a referral fee. Id. at 133. She testified that she had her cell phone with her all day on the day of the shooting. Id. at 137.
Outside the presence of the jury, Bass told the court he had directed his lawyers to call Sanders as a witness, and also to *468 subpoena Tunique Wright, Lewis Gerard, Michael Burns, Brendan Leahy, Thomas Neilson, and Charles Powell. Id. at 142. Counsel advised the court that Powell was still avoiding their subpoena, and that they had advised against calling the other witnesses. Id. at 142-46. The court found Bass had knowingly and voluntarily demanded the testimony. Id. at 146, 151.
The next day, Leahy testified that, on the night of the shooting, he ran into a man on Penn Street who asked him if he was a cop, and then indicated that he was carrying a gun. N.T. 2/26/10 at 10. In his statement to police, Leahy had described the man as "a dark-skinned male in his mid-30s" with a "light mustache" who was 5'8? tall, about 130 pounds, and wearing dark jeans and a black hoodie. Id. at 12. On cross-examination, he acknowledged that he did not have a clear memory of the individual and never saw him carry a shotgun or run. Id. at 15-16. Next, Gerard testified that, on the night of January 30, 2008, he had sold a red container of gasoline to a beardless Hispanic male in his 30s with a close haircut and a red jacket. Id. at 22-23. On cross-examination, he acknowledged that his store did not sell diesel fuel, and on re-direct he conceded the sale took place around midnight. Id. at 25-26.
On March 1, 2010, Neilson testified that, on the night of the shooting, he had heard car doors opening and closing, followed by several loud shots in succession, then saw someone hobbling towards a white car. Id. at 33-35. Next, the court colloquied Bass on his decision not to testify on his own behalf, and concluded he had voluntarily and intelligently waived this right. Id. at 46-48. The court then spoke with counsel in chambers about Bass's request that his former attorney and current investigator testify that he had raised his alibi defense around the time of his arrest, to counter the Commonwealth's suggestion that Sanders had recently concocted it. Id. at 53. Counsel expressed concern because that same testimony would concede that they had been unable to corroborate the alibi, including during earlier conversations with Sanders. Id. Outside the presence of the jury, the trial court explained to Bass why counsel was declining to call the attorney and investigator as witnesses. Id. at 55-56. Bass said he agreed with the strategy. Id. at 56. The trial court also informed Bass that they had been unable to locate witness Michael Burns, despite issuing a bench warrant. Id.
On rebuttal, the Commonwealth re-called Detective Harkins, who testified that the cell phone records showed a call lasting less than one minute between the 267 number and Sanders's phone at 3:00 a.m. on the night of the shooting. Id. at 60.
In closing, counsel argued several points: (1) the jury could find parts of Sanders's testimony credible even if other parts were not credible; (2) the Commonwealth's theory of motive was insufficient to support such a violent crime; (3) Watts and Cassandra were not credible; (4) the inconsistencies in Cook's statement suggested he had not recognized the shooter and had been manipulated by his sister into identifying Bass only after his coma; and (5) the Commonwealth had not connected the evidence of attempted arson with the shooting. Id. at 75-120. The Commonwealth argued that Cook's identification was corroborated by other evidence, and the circumstances showed the malice required for first-degree murder. Id. at 120-149.
On March 2, 2010, the trial court instructed the jury, N.T. 3/2/10 at 4-43, and declined defense counsel's request to include *469 a Kloiber charge,ibr.US_Case_Law.Schema.Case_Body:v1">1 id. at 38-39. The following afternoon, the jury found Bass not guilty of first-degree murder of Cook's fiancée and attempted murder of her unborn child, but guilty of the remaining charges.[2] N.T. 3/3/10 at 6-7.
On April 22, 2010, Bass was sentenced to life in prison for second-degree murder, and 35.5 to 75 years for his other crimes, imposed consecutively to his life sentence. Crim. Dkt. at 5; Tr. Ct. Op. at 1-2. The Superior Court affirmed on June 7, 2011, and the Pennsylvania Supreme Court denied review on November 14, 2011. Crim. Dkt. at 12-13.
On August 21, 2012, Bass filed a petition under Pennsylvania's Post Conviction Relief Act, 42 Pa. C.S. § 9541 et seq. ("PCRA"). Id. at 13. On September 12, 2014, the PCRA court dismissed Bass's petition and granted PCRA counsel's request to withdraw. Id. at 15. The Superior Court affirmed on October 20, 2015, and the Pennsylvania Supreme Court denied review on May 16, 2016. Id. at 17.
On September 8, 2016, Bass timely filed his habeas petition. See Habeas Petition (doc. 1) at 28.
DISCUSSION
Before seeking federal habeas relief, a petitioner must exhaust all available state court remedies, "thereby giving the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004) (citations omitted); see also 28 U.S.C. § 2254(b)(1). To exhaust a federal claim, the petitioner must put the state courts "on notice" that it is before them by "fairly present[ing]" its "factual and legal substance." Bennett v. Sup't. Graterford SCI, 886 F.3d 268, 280 (3d Cir. 2018).
If the petitioner failed to exhaust his state remedies on a claim and the state court would now refuse to review it based on an independent and adequate state procedural rule, I must deny the claim as procedurally defaulted. See Coleman v. Thompson, 501 U.S. 722, 731-32, 735 n.1, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) ; Trest v. Cain, 522 U.S. 87, 90, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997) (declining to prohibit lower courts from raising procedural default sua sponte ); Szuchon v. Lehman, 273 F.3d 299, 322 (3d Cir. 2001) (district courts should not "ignore" procedural default when a petitioner has "deprived the state courts of the opportunity even to examine" an issue). I also may find a habeas claim procedurally defaulted if the petitioner fairly presented it to the state court, but the state court refused to address its merits based on an adequate and independent state procedural ground. Cone v. Bell, 556 U.S. 449, 465, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009).
I may consider a procedurally defaulted claim only if a petitioner demonstrates: (1) a legitimate cause for the default and actual prejudice from the alleged constitutional *470 violation; or (2) that failing to review the claim would cause a fundamental miscarriage of justice. Coleman, 501 U.S. at 750, 111 S.Ct. 2546.
If a claim is not procedurally defaulted and was denied by the state court on its merits, I can grant relief on that basis only if the state court's decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This is a "difficult to meet and highly deferential standard ... which demands that state-court decisions be given the benefit of the doubt." Cullen v. Pinholster, 563 U.S. 170, 181, 131 S.Ct. 1388, 179 L.Ed.2d 557 (2011). Nonetheless, the Antiterrorism and Effective Death Penalty Act ("AEDPA") does not require "speculating as to what other theories could have supported the state court ruling when reasoning has been provided, or buttressing a state court's scant analysis with arguments not fairly presented." Dennis v. Sec'y, Pennsylvania Dep't of Corr., 834 F.3d 263, 281-82 (3d Cir. 2016).
The state court's factual findings must be presumed correct unless the petitioner can show otherwise by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) ; Miller-El v. Cockrell, 537 U.S. 322, 340-41, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." Wood v. Allen, 558 U.S. 290, 300, 130 S.Ct. 841, 175 L.Ed.2d 738 (2010). "Instead, § 2254(d)(2) requires that [federal courts] accord the state trial court substantial deference." Brumfield v. Cain, --- U.S. ----, 135 S.Ct. 2269, 2277, 192 L.Ed.2d 356 (2015).
A state court ruling is "contrary to" clearly established Supreme Court law if it "applies a rule that contradicts the governing law set forth in [Supreme Court] cases," or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) ; see also Breakiron v. Horn, 642 F.3d 126, 131 (3d Cir. 2011). A state court decision constitutes an "unreasonable application" of Supreme Court precedent if it identifies the correct governing legal rule from Supreme Court decisions, but "unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407-08, 120 S.Ct. 1495.
I. Sufficiency of the Evidence
Bass contends the Commonwealth violated his Fourteenth Amendment right to due process when it convicted him based on insufficient evidence. Habeas Mem. (doc. 1 foll. Habeas Pet.) at 26-28.
Bass is entitled to relief only if, "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Parker v. Matthews, 567 U.S. 37, 43, 132 S.Ct. 2148, 183 L.Ed.2d 32 (2012) (citing Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ). I must presume the trier of fact resolved any factual conflicts in favor of the prosecution, and must defer to that resolution. Jackson, 443 U.S. at 326, 99 S.Ct. 2781 ; see also Cavazos v. Smith, 565 U.S. 1, 6, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011). When a state court decision rejects a sufficiency of the evidence challenge, I must determine whether its decision was "objectively unreasonable."
*471 Cavazos, 565 U.S. at 2, 132 S.Ct. 2.
Bass contends the Commonwealth failed to produce sufficient evidence to tie him to the crimes. Habeas Mem. at 26-27. The Superior Court found the Commonwealth had proven all elements of the crime and produced sufficient evidence that Bass was the shooter and was engaged in conspiracy to commit arson. Commonwealth v. Bass, No. 1640 EDA 2010, at 5, 31 A.3d 736 (Pa. Super. June 7, 2011) (" Dir. App. Op."). The court noted that Bass need not have intended to kill the victim to be guilty of second-degree murder, as long as he "knew or should have known that the possibility of death accompanied a dangerous undertaking." Id. at 6. It further noted the verdict was consistent with the jury's determination that Bass was not guilty of the completed crime of arson because attempted arson is sufficient to support a conviction for second-degree murder. Id. at 8 n.1. The court described how the Commonwealth had produced evidence showing: (1) Bass threatened retaliation; (2) molotov cocktails and a canister of gasoline were brought to the victims' home; and (3) Cook had identified Bass as the shooter. Id. at 7-8.
The Superior Court's finding that sufficient evidence supported Bass's convictions was neither contrary to, nor an unreasonable application of, Jackson . The jury found Cook's identification of Bass credible and I cannot reweigh that determination. See Thompson v. Keohane, 516 U.S. 99, 110, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) (witness credibility is a factual issue); Bentley v. Lamas, No. 13-6045 (E.D. Pa. Jan. 16, 2016) (Report and Recommendation) (doc. 56), at 12-13 (same). Moreover, viewing the evidence used to convict Bass in the light most favorable to the prosecution requires crediting Cook's testimony. See Parker, 567 U.S. at 43, 132 S.Ct. 2148.
II. Ineffective Assistance of Trial Counsel
Bass alleges two ineffectiveness claims against trial counsel. Habeas Mem. at 8-26. One focuses on counsel's failure to object to alleged trial court bias. Id. at 8. The second alleges more general errors and appears to assert an actual innocence claim.[3] Id. at 21.
Clearly established federal law governing ineffectiveness claims is set forth in the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) ; see also Premo v. Moore, 562 U.S. 115, 121, 131 S.Ct. 733, 178 L.Ed.2d 649 (2011). Bass must show (1) counsel's performance was deficient, i.e., counsel was not functioning as counsel guaranteed by the Sixth Amendment, and (2) the deficient performance prejudiced him, meaning that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 687, 694, 104 S.Ct. 2052. Pennsylvania applies an equivalent test. See Werts v. Vaughn, 228 F.3d 178, 203 (3d Cir. 2000) ; Commonwealth v. Sneed, 587 Pa. 318, 899 A.2d 1067, 1075-76 (2006).
Counsel's ineffectiveness is measured objectively, considering all the circumstances. See Strickland, 466 U.S. at 687-88, 104 S.Ct. 2052. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Id. at 688, 104 S.Ct. 2052. In evaluating counsel's performance, I must be "highly deferential" and "indulge a *472 strong presumption" that counsel's challenged actions might be considered sound strategy. Id. at 689, 104 S.Ct. 2052. Counsel actions are presumed to reflect a sound strategy unless the petitioner shows "no sound strategy ... could have supported" them. Thomas v. Varner, 428 F.3d 491, 500 (3d Cir. 2005). Thus, a strategic choice "made after thorough investigation of law and facts relevant to plausible options [is] virtually unchallengeable." Strickland, 466 U.S. at 690-91, 104 S.Ct. 2052. The relevant inquiry is not whether Bass's counsel was prudent, appropriate, or perfect. Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987). Rather, the focus is simply to ensure the proceedings resulting in Bass's conviction and sentence were fair. See Strickland, 466 U.S. at 684-85, 104 S.Ct. 2052.
Bass did not raise either ineffectiveness claim in state court. See Dir. App. Op. at 4 (Bass challenged only sufficiency and weight of evidence on direct appeal); Commonwealth v. Bass, No. 2845 EDA 2014, at 2-3 (Pa. Super. Oct. 20, 2015) (Bass raised four PCRA claims, all different from his federal claims). These claims are procedurally defaulted because Bass failed to raise them in state court and can no longer present them there, based on an adequate and independent state law ground. 28 U.S.C. § 2254(b) ; Gray v. Netherland, 518 U.S. 152, 161, 116 S.Ct. 2074 (1996) ; see also Pa. R.A.P. 903 ; 42 Pa. C.S. § 9545(b)(1).
Bass acknowledges that his ineffectiveness claims are procedurally defaulted, but contends that Martinez v. Ryan, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012) creates cause and prejudice to excuse his default. Habeas Mem. at 8-21. He must establish that: (1) "in the initial-review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective;" and (2) the underlying claim is "substantial," meaning it has "some merit." Martinez, 566 U.S. at 17, 132 S.Ct. 1309. Whether a claim is "substantial" is a "threshold inquiry that does not require full consideration of the [claim's] factual or legal bases." Bey v. Superintendent Greene SCI, 856 F.3d 230, 238 (3d Cir. 2017) (citation omitted).
As explained below, Bass cannot meet the narrow Martinez exception because his claims are not "substantial." Id. Thus, Bass's ineffective assistance of counsel claims are procedurally defaulted. See Coleman, 501 U.S. at 735 n. 1, 111 S.Ct. 2546.
1. Failure to Object to the Trial Court's Plain Error
Bass argues trial counsel was ineffective for failing to object to the trial court's plain error. Habeas Mem. at 10. He breaks this claim into three parts, first alleging counsel was ineffective for failing to object when the trial court limited cross-examination of the Commonwealth's witnesses, in violation of the Sixth Amendment. Id.
The Sixth Amendment's Confrontation Clause guarantees criminal defendants the right to confront witnesses who testify against them. Pointer v. Texas, 380 U.S. 400, 401, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The main purpose of this right is to provide "the opportunity [for] cross-examination." Davis v. Alaska, 415 U.S. 308, 315-16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Nonetheless, the Confrontation Clause does not guarantee "cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). Instead, trial judges retain "wide latitude" to limit cross-examination based on factors like concern for the witness and relevance. United States v. Ferguson, 394 F. App'x 873, 883 (3d Cir. 2010). Moreover, even if a trial court ruling has violated the Confrontation *473 Clause, the violation may be harmless. Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (harmlessness is determined by considering: (1) the testimony's importance, (2) whether the testimony was cumulative, (3) other corroborating and/or contradicting testimony, (4) the cross-examination that was allowed, and (5) the overall strength of the case).
A. Failure to Object to Trial Court Error
Bass asserts 13 objections to the trial court's management of cross-examination. Habeas Mem. at 10-14. Some of these objections inaccurately characterize the trial transcript, and the other alleged errors did not prejudice Bass's defense.
Bass first contends that, while the court interrupted his cross-examination, it did not interrupt the Commonwealth's direct examination of its first witness. Habeas Mem. at 11. Bass fails to specify any objectionable question, and my review has revealed none. See N.T. 2/22/10 at 4-15.
Bass also objects to the trial court's interruption of the following portion of Officer Lewis's cross-examination:
Q : When you get the information, where in the 15th District are you?
A : I'm in the lower end patrolling.
Q : What streets?
Court : What difference does it make?
Counsel : I'm just going to get time, Judge, and how he got there.
Court : You can ask about times. That's not what you asked him. Ask him about times.
N.T. 2/22/10 at 16-17.
The trial court did not abuse its discretion in limiting cross-examination because it did not "cut[ ] off all questioning about" a relevant topic. Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431. Instead, the trial court exercised its "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination," by focusing defense counsel's questions more narrowly. Id.
Bass also objects to the court's sustaining a Commonwealth objection during cross-examination. Habeas Mem. at 11 (citing N.T. 2/22/10 at 23). He is factually wrong. After counsel contested that ruling, the court allowed the witness to respond. N.T. 2/22/10 at 23. Counsel cannot have been ineffective for failing to object to a trial court error he was able to forestall.
Bass argues that, "[d]uring direct examination of Commonwealth witness Kevin Cook the trial court did not interrupt the examination a single time." Habeas Mem. at 11. Again, he is wrong. The transcript shows the court interrupted the Commonwealth's direct examination four times, several times in front of the jury and the final time by calling counsel to sidebar and cutting off the line of questioning. N.T. 2/22/10 at 104, 124 (interrupting Commonwealth twice), 128 (instructing Commonwealth to "go on to something else").
Bass complains the trial court interrupted Cook's cross-examination, expressed inappropriate sympathy for Cook, and gave "a break in the proceedings." Habeas Mem. at 12. When the trial court recessed, Cook had been testifying for two-and-a-half hours about the incident that killed his wife and permanently disabled his daughter and himself. N.T. 2/22/10 at 191. Because Cook had increasing difficulty answering questions, the trial court asked whether he needed the questioning to stop, and then ordered a "short recess." Id. Only outside the presence of the jury did the court opine that Cook had "had it." Id. at 192. The court discussed the issues counsel wanted to pursue on cross-examination, focused counsel's questions, and then let cross-examination proceed.
*474 Id. at 193-210. The court also explained to Bass's counsel that, "the more you question him, the more he breaks down ... and that's not going to help you with the jury." Id. at 194. This trial management does not reflect unfair bias against the defense, but rather consideration for a witness and trial efficiency. Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431. Bass has identified no error to which trial counsel should have objected.
Although Bass complains that the trial court "interrupt[ed]" and "prohibit[ed]" cross-examination of Victor Clark, the record shows only three Commonwealth objections on which the trial court ruled. N.T. 2/22/10 at 229, 231, 233. The first objection was properly sustained, id. at 229 (proper hearsay objection), the second was overruled, id. at 231, and the third question was answered despite the Commonwealth's sustained objection, id. at 232-33. There was no trial court error or bias. See Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431.
Bass also complains that the court's cross-examination management prevented counsel from demonstrating the changes in Cassandra Cook-Powell's statements over time and her motive for testifying against him. Habeas Mem. at 12-13. Although the trial court interrupted counsel's cross-examination of Cassandra, it did so only outside the presence of the jury. N.T. 2/23/10 at 72. Counsel was had asked whether the television was on inside the Cook home at the time of the shooting. Id. At sidebar, the trial court questioned the relevance of this inquiry, and counsel explained he wanted to know if there was any impediment to her hearing. Id. at 73. The trial court explained this was not relevant because whether shots were fired was not in dispute. Id. The witness had been on the stand for more than an hour, and the trial court instructed counsel to limit questions to only relevant issues. Id. This does not constitute trial court error or evince bias. See Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431.
During Cassandra's cross-examination, defense counsel had her read her police statement, in contravention of an earlier court ruling. Id. at 75-76. When the Commonwealth objected, the Court addressed the issue outside the presence of the jury. Id. at 76-87. At sidebar, the Commonwealth argued it had specifically questioned Cassandra about her conflict with Bass without mentioning their alleged scheme to submit fraudulent tax returns, in deference to the court's earlier ruling. Id. at 76-81. The Commonwealth contended defense counsel had created the appearance that the Commonwealth had been hiding the illegal activity, rather than following court orders. Id. The trial judge ordered both parties to refrain from using the information about the tax scheme, and instructed the jury to disregard the police statement that had been read into the record. Id. at 86, 90. Trial counsel had no additional questions for Cassandra. Id. at 89. This ruling does not demonstrate bias against Bass.
Bass argues Cassandra had "an engagement with the Federal Prosecutor in regards to" tax fraud and identity theft, and contends further cross-examination would have revealed her "corrupt motive for testifying against" him. Habeas Mem. at 12-13. Cassandra, however, "wasn't granted immunity with any violation of the tax code." N.T. 2/23/10 at 79. She was granted immunity from potential state charges of breaking the windows of Bass's house and biting a Philadelphia police officer the night of the shootings, both of which she disclosed to the jury during her direct testimony. Id. at 18. Bass's counsel was able to inform the jury of Cassandra's motivation for testifying, and her bias.
*475 The trial court allowed extensive cross-examination regarding Cassandra's immunity agreement, her drinking and fighting the night of the shooting, her time alone with Cook before he identified Bass, and the illegal tax refund scheme. N.T. 2/23/10 at 22-76. Bass fails to identify any vital information the trial court's cross-examination management concealed.[4]
Bass also states the "trial court took no action" when it learned Sanders had been threatened and pressured not to testify by Detective Harkins. Habeas Mem. at 13 (referencing N.T. 2/25/10 at 62-63). Although Bass contends Sanders was terrified of testifying, and says the intimidation "clearly affected her testimony," he fails to specify how. Id.
The court informed defense counsel that, if Sanders did not answer his questions, he could allow the jury to hear what Detective Harkins had told her. N.T. 2/25/10 at 66. Sanders, however, did not decline to answer any questions. Id. at 83-137. There was therefore no reason for the jury to hear Harkins's threats. The main weakness in Sanders's testimony was that she had not provided an alibi defense until Bass's trial had already begun. Id. at 125-26. This failure could not have been affected by Harkins's behavior, which took place long after Sanders had repeatedly failed to come forward. Id. at 54-55.
Bass has not identified any unconstitutional limitation on his right to confront witnesses. Therefore, counsel was not ineffective for failing to object to the trial court's cross-examination management. See United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument."). Bass cannot establish a "substantial" claim that would excuse default under Martinez, 566 U.S at 17, 132 S.Ct. 1309.
B. Failure to Object to Trial Court Bias
Bass argues trial counsel was ineffective for failing to object to the court's apparent bias. Habeas Mem. at 14. He contends the court treated defense counsel more harshly than it treated the prosecutor, citing eight examples of improper conduct. Id. at 14-16. My review shows the court adopted the same tone with both sides. Bass's examples either incorrectly describe the record or are meritless.
Bass first objects to the court's interruption of Officer Lewis's cross-examination. Habeas Mem. at 15 (citing N.T. 2/22/10 at 16). This did not demonstrate bias because the court cut off a line of irrelevant inquiry and focused counsel's questions on relevant issues. Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431. Later in the cross-examination of Lewis, Bass claims the court further interrupted defense counsel and spoke to him "in a demeaning manner." Habeas Mem. at 15. The record, however, shows the court sustained a valid hearsay objection, allowed the same question to go forward in a non-hearsay form, assisted defense counsel when he misspoke, and then assisted defense counsel again when Officer Lewis failed to answer his question. N.T. 2/22/10 at 21-23, 26.
*476 Bass next contends that, during Officer Fox's testimony, the court was respectful to the prosecution, "acting as Commonwealth's advocate, explaining evidence," but changed tone "during trial counsel's cross-examination." Habeas Mem. at 15 (citing N.T. 2/22/10 at 41, 44, 51-53, 56, 67-68). The cited pages, however, merely show the court sustaining valid Commonwealth objections and helping defense counsel locate the specific Commonwealth crime-scene photograph most helpful to his cross-examination. See id. at 60-61, 65.
Next, Bass asserts that the court prohibited counsel from eliciting evidence during cross-examination of Victor Clark. Habeas Mem. at 15 (citing N.T. 2/22/10 at 228-30). The transcript shows only that the trial court sustained a valid hearsay objection. N.T. 2/22/10 at 228-30.
Bass's fourth, fifth, and sixth objections revisit his prior complaints about the court's cross-examination management of Cook, Cassandra, and Sanders. Habeas Mem. at 15 (citing N.T. 2/22/10 at 191-201; N.T. 2/23/10 at 70-73; N.T. 2/25/10 at 54-56, 61-64). As previously discussed, however, the court's rulings and demeanor during these cross-examinations were fair. See supra Section 2.A; Van Arsdall, 475 U.S. at 679, 106 S.Ct. 1431.
Bass's seventh objection is that the court interrupted the direct examination of defense witness Lewis Gerard. Habeas Mem. at 16 (citing N.T. 2/25/10 at 69-72). In the pages Bass cites, however, the court merely suggested Gerard's testimony was not strong defense evidence during an off-the-record witness proffer. N.T. 2/25/10 at 70-72. The court did not prevent trial counsel from calling him, and did not interrupt once during his direct or re-direct testimony. N.T. 2/26/10 at 18-23, 26.
Bass's final claim is that the court called him "stupid" for wanting to put a defense before the jury. Habeas Mem. at 15. The trial court did not describe Bass as stupid, but rather "not unintelligent" and "intelligent," outside the presence of the jury. N.T. 3/1/10 at 21-22. The court did note that Bass had insisted on pursuing a "stupid strategy for his defense," but this comment was also made outside the jury's presence. Id. at 20 ("it's very clear to all of us that he's hurting himself with these witnesses"). The colloquy, in which the court questioned Bass's decision to call witnesses against the advice of counsel, was also outside the presence of the jury. N.T. 2/25/10 at 140-52. The court's comments reflect concern for Bass, not disdain or bias. Counsel's failure to object to them is not ineffective assistance. Sanders, 165 F.3d at 253.
C. Failure to Object to the Jury Charge
Bass argues counsel was ineffective for failing to make three objections to the jury instructions. Habeas Mem. at 17.
First, Bass argues the court should have given a Kloiber instruction. Id. at 18 (citing N.T. 2/26/10 at 44). Counsel, however, requested a Kloiber instruction. N.T. 2/26/10 at 43-44. The court found the charge unwarranted because the only identification was by Cook, who did not equivocate or fail to identify Bass: "The Kloiber case is not about failing to immediately tell the police the name.... there are no grounds here for the jury to receive [Cook's identification] with caution." Id. at 44. Counsel was not ineffective for failing to object after the court denied his request pursuant to state law.[5] See, e.g., *477 Hunte v. Ferguson, No. 14-1641, 2017 WL 368084, at *3 (E.D. Pa. Jan. 25, 2017) (Rufe, J.) ("because Petitioner's counsel requested such an instruction, which the trial court found was unwarranted under Pennsylvania law, there was no point in counsel objecting to this denial").
Bass also claims the court should have instructed the jury about "government conduct which is so outrageous as to implicate a violation of Petitioner's due process rights," based on Harkins's alleged intimidation of Sanders. Habeas Mem. at 19. Sanders, however, testified despite Harkins's behavior. N.T. 2/25/10 at 83-137. Thus, Bass failed to show the behavior had any detrimental effect on his defense. See supra, Section 2.A. Bass has provided no basis for the court to have given this instruction.
Bass also claims the trial court should have given an alibi instruction, Habeas Mem. at 19, which it did, N.T. 3/2/10 at 17-18.
Bass has failed to cite any instances of trial court bias or violations of due process. Trial counsel cannot have been ineffective by failing to object. Sanders, 165 F.3d at 253.
2. Ineffective Assistance of Counsel Resulting in the Conviction of One Who is Actually Innocent
Titled as "actual innocence," Bass's next claim raises additional procedurally defaulted claims of ineffective assistance of counsel. Habeas Mem. at 21-26.
A prisoner's "convincing showing of actual innocence" may serve as a "gateway" to judicial review of an otherwise procedurally barred petition. McQuiggin v. Perkins, 569 U.S. 383, 386, 133 S.Ct. 1924, 185 L.Ed.2d 1019 (2013). To obtain review through the actual innocence gateway, a petitioner must provide "(1) new evidence (2) that is reliable and (3) so probative of innocence that no reasonable juror would have convicted." Sistrunk v. Rozum, 674 F.3d 181, 191 (3d Cir. 2012). Bass cites no new evidence, and fails to meet his burden. See id. at 192 (exception "sets a supremely high bar"); Schlup v. Delo, 513 U.S. 298, 324, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995) ("claims of actual innocence are rarely successful"). Because his claims are not "substantial," the procedural default cannot be excused under Martinez. 566 U.S. at 17, 132 S.Ct. 1309.
A. Failure to Properly Prepare For Trial
Bass complains trial counsel failed to properly investigate: (1) his alibi, (2) his allegedly fraudulent tax returns, (3) additional witnesses, and (4) whether Charles Powell was the actual shooter. Id. at 22-23. "In the context of ineffective assistance based on counsel's failure to investigate, the court must determine whether counsel exercised 'reasonable professional judgment.' " Jacobs v. Horn, 395 F.3d 92, 102 (3d Cir. 2005) (citing Wiggins v. Smith, 539 U.S. 510, 522-23, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) ).
Bass's first complaint, that counsel "never made any effort to investigate" his alibi, is contradicted by the record. Counsel's investigator testified that she visited the bar where Bass contends he spent the evening of the shooting with Sanders. N.T. 2/25/10 at 80. She spoke with the bartender, who claimed he did not know Bass or recall his presence that evening. Id.
*478 Bass's second complaint is that counsel should have subpoenaed his tax records to disprove Cassandra's testimony that she had provided him information to submit a fraudulent return and "impeached the alleged motive being advanced by the Commonwealth." Habeas Mem. at 23. The Commonwealth's theory, however, was that Bass was motivated by Cassandra's breaking his windows, not by the fraudulent tax submission. N.T. 3/1/10 at 139. Cassandra admitted that she broke Bass's windows, so the Commonwealth's theory of motive would have been the same regardless whether Bass utilized the fraudulent information Cassandra alleges she provided him.
Bass's third complaint is that trial counsel failed to call the following witnesses: Tunique Wright, Lewis Gerard, Michael Burns, Brendon Leahy, Thomas Neilson, and counsel's investigator, Sharon Williams. Habeas Mem. at 23. The record, however, shows that Wright was brought to court and invoked her Fifth Amendment right not to testify.[6] N.T. 3/1/10 at 24-27. Burns could not be found, even after the court issued a bench warrant. N.T. 3/1/10 at 7, 56. Gerard, Leahy, and Neilson testified. N.T. 2/26/10 at 7-18 (Leahy), 18-26 (Gerard); N.T. 3/1/10 at 33-43 (Neilson). Sharon Williams did not testify because counsel determined her testimony that Bass had told counsel about his alibi early on would have been outweighed by her testimony that she was unable to confirm his alibi, including by speaking with Sanders. N.T. 3/1/10 at 55. Moreover, Bass was colloquied about counsel's decision not to call Williams and concurred. Id. at 56.
Bass's fourth complaint, that trial counsel failed to investigate the theory that Powell shot Cook in "a domestic dispute turned deadly," Habeas Mem. at 23-24, is contradicted by the record. Counsel sought to subpoena Powell, who intentionally eluded service. N.T. 2/25/10 at 74, 142-43. Moreover, attaching suspicion to Powell by highlighting his absence to the jury was a major focus of counsel's closing argument. N.T. 3/1/10 at 98, 110, 113, 116. Counsel presented to the jury the other information supporting this theory: the couple had been fighting, there was blood in their car, and Powell was outside with Cook earlier in the evening. N.T. 2/22/10 at 159-61, N.T. 2/23/10 at 61. There is no basis to find counsel failed to make a reasonable investigation into Powell, and it is therefore not a "substantial claim" that would excuse Bass's procedural default. Martinez, 566 U.S. at 17, 132 S.Ct. 1309.
B. Trial Counsel Denied Petitioner Due Process of Law by Failing to Properly Cross-Examine Witnesses
Pursuant to his claim that counsel should have proven the alternative domestic dispute theory of the murder for the jury, Bass contends counsel failed to properly cross-examine Detective Harkins, Officer Wilson, and Officer Fox concerning the police investigation. Habeas Mem. at 25. Specifically, Bass alleges counsel failed to ask the officers about the failure to search Cook's residence, and the cars belonging to Cassandra, Clark, and Powell. Id. at 24-25. Counsel, however, did question police about the investigation of the cars and further investigation of Cook. N.T. 2/22/10 at 69-70, 72, 80, 83; N.T. 2/24/10 at 178-80, 218. Because counsel's cross-examination covered the limitations of the police investigation, this claim is not substantial and procedural default is not excused. Martinez, 566 U.S. at 17, 132 S.Ct. 1309.
*479 C. Petitioner was Denied Due Process of Law when Trial Counsel Failed to Request a Missing Witness Charge
Bass also argues counsel was ineffective for failing to request a missing witness charge when they were unable to call Powell. Habeas Mem. at 25.
In Pennsylvania, a defendant can ask the court to instruct the jury that it can draw a negative inference against the Commonwealth based on a missing witness, if the defendant can show: (1) the missing witness's testimony would have ordinarily been expected to favor the Commonwealth, (2) the witness was available only to the Commonwealth, and (3) there is no other reasonable explanation for failing to produce the witness. Commonwealth v. Evans, 444 Pa.Super. 545, 664 A.2d 570, 573-74 (1995).
Powell, however, was apparently dodging a bench warrant while eluding Bass's counsel. N.T. 2/25/10 at 74. There is no evidence he was "peculiarly within the knowledge and reach" of the Commonwealth, as counsel would have been required to show in order to merit the missing witness charge. Commonwealth v. Newmiller, 487 Pa. 410, 409 A.2d 834, 839 (1979). Counsel cannot have been ineffective for failing to request an inapplicable charge. Sanders, 165 F.3d at 253. Therefore, this is not a "substantial claim," Martinez, 566 U.S. at 17, 132 S.Ct. 1309, and its procedural default is not excused.
Accordingly, I make the following:
RECOMMENDATION
AND NOW, on April 30, 2018, it is respectfully recommended that the Petition for Writ of Habeas Corpus be DENIED with prejudice. It is further recommended that there is no probable cause to issue a certificate of appealability.[7] Bass may file objections to this Report and Recommendation within 14 days after being served with a copy. See Local Civ. Rule 72.1. Failure to file timely objections may constitute a waiver of any appellate rights. See Leyva v. Williams, 504 F.3d 357, 364 (3d Cir. 2007).

Although the Court grants the Motion to Supplement Objections, the Court will not consider issues not raised in the Petition. See Codner v. Warden-Pike Cty. , Civil Action No. 15-5176, 2016 WL 5721199, at *6 (E.D. Pa. Oct. 3, 2016) ("This Court joins the other courts within this district that have declined to address claims raised for the first time in objections on the basis that it is too late to raise them now for the first time.") (collecting cases); Fowler v. Mooney , Civil Action No. 14-1768, 2015 WL 6955434, at *2 (E.D. Pa. Nov. 9, 2015) ("The Court concludes that the interest of justice does not require consideration of the new claims because all such claims could have been presented to the magistrate judge by pro se petitioner, and he failed to do so. Thus, the objections purporting to raise new claims not presented to the magistrate judge are overruled.").

The Court agrees with the conclusions of the thorough R & R. Briefly, it was not unreasonable for the state courts to conclude that there was sufficient evidence at trial to establish that Petitioner shot and killed Emine Hadredinaj, who was pregnant, and wounded Kevin Cook, because of a dispute with Cook's sister. Although various witnesses gave conflicting statements before trial, the credibility of the witnesses (including Cook, who identified Petitioner as the shooter) was for the jury to determine. There was also evidence in connection with the arson-related charges that Petitioner had brought a gas can and Molotov cocktails with him to Cook's house. Trial counsel was not ineffective for failing to object to the trial court's limiting of certain lines of inquiry as the record shows that trial court directed both the prosecution and defense to keep questioning to relevant matters and refrain from referring to excluded evidence. The R & R also correctly rejected Petitioner's claims that the trial counsel was ineffective for failing to object to the jury instructions as the claims are unsupported by the record. Nor has Petitioner shown that a witness, Jillian Sanders, was intimidated by the police before testifying; Sanders answered every question asked of her at trial and the only inconsistency in her testimony was the date that Cassandra Cook broke Petitioner's windows. Petitioner also claims that trial counsel should have interviewed Sanders about Petitioner's alibi sooner than he did. However, the record shows that, at trial, Petitioner requested that his investigator testify that Petitioner had raised an alibi defense around the time of his arrest. This was meant to counter the prosecution's argument that Sanders concocted Petitioner's alibi just before testifying. Trial counsel expressed concern over this tactic because the testimony would concede that the investigator was unable to corroborate Petitioner's alibi, even during earlier conversations with Sanders. Thus, the record shows that (1) Sanders was previously interviewed and (2) that she was not able to corroborate Petitioner's alibi claim at that time, which would have been damaging to Petitioner's case. Petitioner agreed with counsel's strategy at the time. As set forth in the R & R, Petitioner has not shown constitutional error regarding any other witnesses.
With regard to issues raised by Petitioner for the first time in his objections to the R & R (including that trial counsel was ineffective for failing to object to request a "lesser-included offense" instruction on the arson charge, failing to submit police statements of two witnesses into evidence, failing to file a motion to suppress evidence obtained from the search of Petitioner's cell phone pursuant to a warrant, failing to object to evidence linking a cell phone number to Petitioner, allowing a witness to invoke her Fifth Amendment right not to testify, and failing to call character witnesses), the Court is not required to consider issues not raised in the Petition itself and Petitioner has not shown that these claims have been exhausted or that the failure to exhaust may be excused.

There is no basis for concluding that "reasonable jurists could debate whether...the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel , 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (internal citation omitted).

In Pennsylvania, this instruction informs the jury that an eyewitness' identification should be viewed with caution where the eyewitness: (1) did not have an opportunity to clearly view the defendant; (2) equivocated on the identification of the defendant; or (3) had a problem making an identification in the past. Commonwealth v. Rollins, 558 Pa. 532, 738 A.2d 435, 448 n.14 (1999) (citing Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820, 826-27 (1954) ).

During deliberations, the jury requested the statements Cassandra and Watts had made to police. N.T. 3/2/10 at 45-46. Those requests were denied because the statements had not been admitted as evidence. Id. The court granted the jury's request to view the photo array from which Bass was identified. Id. at 46-47.

See Leamer v. Fauver, 288 F.3d 532, 547 (3d Cir. 2002) (requiring liberal construction of pro se complaints).

Moreover, Bass fails to show any alleged errors prejudiced his defense. The core of Cassandra's testimony was that she broke the windows of Bass's house. N.T. 2/23/10 at 10. Cassandra, Cook, and Watts testified consistently on that point, and had been consistent since they first spoke to police. N.T. 2/22/10 at 114; N.T. 2/23/10 at 10, 42, 97. Sanders acknowledged that her windows had been broken by someone who thought Bass owed them money. N.T. 2/25/10 at 91. Any error was harmless in the context of the cross-examination that was allowed, the corroborating testimony, and the overall strength of the case against Bass. Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431.

Pennsylvania and Third Circuit law requiring cautionary instructions for eyewitness identifications are "almost identical." DeShields v. Kerestes, No. 13-1965, 2014 WL 2737413, at *13 (M.D. Pa. June 13, 2014) (citing United States v. Wilford, 493 F.2d 730, 733 (3d Cir. 1974) ). Nonetheless, there is no federal claim here because "eyewitness cautionary instructions for the Third Circuit [are] imposed under the court of appeals' supervisory power," rather than its authority to institute constitutional protections. Lee v. Capozza, No. 14-143, 2015 WL 9244833, at *2 (W.D. Pa. Dec. 18, 2015) (citing Wilford, 493 F.2d at 733 ).

Wright's testimony would also likely have been irrelevant because she broke Sanders's windows only after the murder. N.T. 3/1/10 at 24-27.

Because jurists of reason would not debate my recommended disposition of the petitioner's claims, a certificate of appealability also should not be granted. See Slack v. McDaniel, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).